UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JEFF CORBETT, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>PUBLIC EMPLOYEES' RETIREMENT SYSTEM et al.,<br><br>  Defendants. | Case No. 2:20-cv-02149-KJD-NJK<br><br>ORDER |

Presently before the Court is Defendant Las Vegas Metropolitan Police Department's and Plaintiffs' Motions for Summary Judgment (#34/#35). Both parties filed oppositions (#38/#39) to which both parties replied (#40/#41).

I.   Factual and Procedural Background

Plaintiffs Jeffrey Corbett ("Corbett"), Scott Murray ("Murray"), Dave Newton ("Newton"), and John Jenkins ("Jenkins") have all worked for Defendant Las Vegas Metropolitan Police Department ("Metro") for between 15 and 20 years each as K-9 handlers. The Metro K-9 unit is a support unit within the Department and the "Handlers" are officers assigned patrol service dogs ("PSDs") to aid Metro in fulfilling its law enforcement duties. Handlers manage several types of PSDs, including patrol dogs, explosive detection dogs, narcotic detection dogs, and human remains detection dogs. (#34-5, at 3). Handlers are responsible for the actions of their PSDs at all times and maintain control of the dogs while both on and off-duty. Id. at 4-5. Handlers are responsible for "bathing, brushing, feeding, and provid[ing] fresh water, etc., 365 days a year" as well as inspecting for injuries and accompanying the dogs to veterinary appointments. Id. If a Handler is away on vacation, the Handler is responsible for making sure the dogs are taken care of. Id. at 6. Handlers routinely work with other specialized units like SWAT, Search & Rescue,

Major Violators, Narcotics, and the Bomb Squad. (#34-3, at 12). Handlers are also provided a specially-equipped patrol vehicle for the entire duration of the officers' assignment in the K-9 unit, which the Handler has possession and use of 365 days a year, 24 hours per day. (#35, at 200).

Each of the Plaintiffs were subject to a Collective Bargaining Agreement ("CBA") between the Department and the Las Vegas Police Protection Association, Inc. ("PPA"). (#34-6). The PPA is an employee organization and was the exclusive bargaining agent for the Plaintiff's bargaining unit. Id. NRS 288.150 states that:

> 1. Except as otherwise provided… every local government employer shall negotiate in good faith through one or more representatives of its own choosing concerning the mandatory subjects of bargaining set forth in subsection 2 with the designated representatives of the recognized employee organization, if any, for each appropriate bargaining unit among its employees. If either party so requests, agreements reached must be reduced to writing.
>
> 2. The scope of mandatory bargaining is limited to:
>
> (a) Salary or wage rates or other forms of direct monetary compensation.

The CBA is a negotiated contract required under Nevada law. The CBA represents the parties' "understanding concerning wages, hours, and conditions of employment." (#35-6, at 8). Both Plaintiffs and Metro are bound by the terms of the CBA. The CBA sets forth the agreed-upon compensation Handlers receive:

> **13.8 K-9 Pay.** K-9 handlers will receive ten (10) hours of paid overtime per pay period for the at-home care, grooming, transportation, and feeding of the dog. The handler will receive an additional five (5) hours of overtime pay per period if assigned a second dog, effective July 1, 2006.

Id. at 30. Prior to the current K-9 pay arrangement, Handlers experienced increases in compensation related to PSD care and maintenance, specifically, in the 1997-2001 CBA, Handlers received five hours of overtime bi-weekly for their responsibilities. (#34-7). Then, in the 2001-2005 CBA, the compensation was doubled to ten hours of overtime pay, bi-weekly. (#34-8). In the 2006-2009 CBA, the parties included an added five hours of overtime pay for

1  Handlers responsible for two PSDs, which is the current K-9 Handler rate. (#34-9). The
2  Department and the PPA determined the reasonable amount of compensation for Handlers based
3  upon the Handlers' duties, and based upon reviewing compensation paid by other agencies, as
4  well as caselaw. (#34-10, at 3).

5  The CBA also includes an article which addresses "Assignment Differential Pay" ("ADP").
6  (#34-6, at 28). ADP is defined as "temporary monetary compensation paid to commissioned
7  personnel who are working in the assignment categories listed [in the ADP Article]." Id. These
8  categories include "police officer II," motorcycle officers, helicopter pilots, resident officers, and
9  training officers. Id.

10  Metro contributes to the Nevada Public Employee Retirement System ("PERS"), based on
11  certain classifications of employee duties. The Plaintiffs were enrolled in the PERS fund. (#35, at
12  69). Metro's Department Manual defines overtime pay as "[c]ompensation earned by an
13  employee who is held over on his regular shift or is requested to return to duty at a time that is
14  more than twelve hours after notice is given." Id. at 114. It also states that overtime pay "is NOT
15  subject to retirement system contributions." Id. at 115. The Department Manual states that
16  "[e]mployees who are on sick leave, worker's compensation, FMLA, military leave, maternity,
17  paternity… are not eligible to work overtime of any kind" and employees are not eligible for
18  overtime pay on any day "they are on compensatory leave, vacation, bonus, off in lieu of
19  holiday" etc. Id. Plaintiff's received K-9 pay while on vacation and while on various other types
20  of leave from work. Their pay did not fluctuate based on the actual time spent caring for the
21  dogs. The fact that in the Metro payroll system, K-9 pay was distinct from overtime pay does not
22  change or overcome the express provision of the CBA that Handlers pay would be treated as
23  overtime. (#35, at 171-78).

24  Plaintiffs would spend additional time off-duty caring for the PSDs. Jenkins testified that on
25  average, he would spend about 20 to 26 hours per pay period performing these duties. Id. at 71.
26  Corbett would spend on average eight hours per pay period while off duty. Id. at 64. Murray and
27  Newton both estimated that they spent an additional 266 hours per year caring for his PSDs that
28  they were not paid for. Id. at 163, 168. These off-duty hours were not tracked or logged by the

1   Plaintiffs and were not required to be tracked by Metro. Id. at 120. There would be no reason to
2   do so as the CBA established the agreement of the parties concerning the value of the services to
3   be rendered by the Handlers.
4       Plaintiffs were also tasked with helping dogs with any medical issues like injuries and
5   illnesses. Id. at 163. For example, Corbett's dog was stabbed, and he cared for the dog
6   extensively for two weeks to ensure that the dog healed. Id. at 79. Handlers were also obligated
7   to accept the risk of being bitten by their PSDs. Id. at 30. Newton's PSD bit his right middle
8   finger which required 11 stiches. Id. at 137.
9       The Plaintiffs bring 12 claims against Metro in their Amended Complaint: (1) Unpaid
10  Pension Contributions/Benefits; (2) Unpaid Overtime; (3) Assignment Differential Pay; (4)
11  Breach of Fiduciary Duty; (5) Breach of Statutory Duty; (6) Negligence; (7) Unjust Enrichment;
12  (8) Unpaid Wages; (9) Liquidated Damages; (10) Attorney Fees; (11) Declaratory Judgment; and
13  (12) Injunctive Relief. (#1-2). The parties bring cross-motions for summary judgment, arguing
14  each party, respectively, is entitled to judgment in their favor as a matter of law.
15      II.    Legal Standard
16      Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,
17  and admissions on file, together with affidavits, if any, show that there is no genuine issue as to
18  any material fact and that the moving party is entitled to a judgment as a matter of law. See FED.
19  R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party
20  bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex,
21  477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts
22  demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio
23  Corp., 475 U.S. 574, 587 (1986).
24      All justifiable inferences must be viewed in the light most favorable to the nonmoving party.
25  See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere
26  allegations or denials of his or her pleadings, but he or she must produce specific facts, by
27  affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine
28  issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "[T]here is a

1  preliminary question for the judge, not whether there is literally no evidence, but whether there is
2  any upon which a jury could properly proceed to find a verdict for the party producing it[.]" Id.
3  at 251. "Where evidence is genuinely disputed on a particular issue—such as by conflicting
4  testimony—that 'issue is inappropriate for resolution on summary judgment.'" Zetwick v. Cnty.
5  of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (quoting Direct Techs., LLC v. Elec. Arts, Inc., 836
6  F.3d 1059, 1067 (9th Cir. 2016)).

7  "[Q]uestions of statutory and Constitutional interpretation are questions of law, which may
8  properly be resolved at summary judgment." Washington v. Trump, 441 F.Supp. 1101, 1112
9  (W.D. Wash. 2020).

10  III.    Analysis

11  Metro argues that the claims against it should be dismissed because Plaintiffs were subject to
12  a negotiated collective bargaining agreement, which provided for the Handlers' care for the dogs,
13  and now Plaintiffs attempt to "use this litigation to secure a benefit their bargaining agent was
14  unable to obtain in collective bargaining." (#34, at 2). Metro also argues that the Plaintiffs' duties
15  consisted of overtime pay and Metro was not obligated to contribute to Plaintiffs' retirement
16  fund. Id. Metro argues ADP "is not a legally required form of compensation, and instead, is an
17  added benefit agreed-upon between the Department and the Plaintiffs' recognized, exclusive
18  bargaining agent." Id. Metro asserts that because all of Plaintiffs' claims are contingent on the
19  payment of this overtime and ADP, which they cannot prevail on, all the claims must be
20  dismissed. Id.

21  On the other hand, Plaintiffs argue that Metro ignores that NRS 286 requires contributions to
22  the Nevada Public Employee Retirement System ("PERS"), and that the K-9 Handlers' pay is
23  not considered "overtime pay" and instead is "compensation" under a number of theories. (#39,
24  at 2). Plaintiffs also argue that that Metro makes a simplistic argument regarding the CBA, and
25  that it supplants statutory requirements requiring employees to receive payment for all hours
26  worked. Id. at 3. Finally, Plaintiffs argue that they are entitled to ADP because they are police
27  officers and fall under the relevant category entitled to ADP. Id.
28

### A. Unpaid Pension Contributions to PERS

Plaintiffs claim that their K-9 pay is not overtime pay, but rather, is compensation and that Metro was obligated to and failed to contribute funds to their retirement account. Id. Metro argues that the Handlers' off-duty care is not PERS compensable. (#40, at 3). Essentially, the crux of this issue is whether the K-9 pay is "compensation" or "overtime."

NRS 286.025 defines the types of compensation for which PERS contributions are required:

> NRS 286.025 "Compensation" defined.
>
> 1. Except as otherwise provided by specific statute, "compensation" is the salary paid to a member by the member's principal public employer.
>
> 2. The term includes:
>
> (a) Base pay, which is the monthly rate of pay excluding all fringe benefits.
>
> (b) Additional payment:
>
> (1) As applicable to a member who has an effective date of membership before January 1, 2010, for longevity, shift differential, hazardous duty, work performed on a holiday if it does not exceed the working hours of the normal workweek or pay period for that employee, holding oneself ready for duty while off duty and returning to duty after one's regular working hours.
>
> (2) As applicable to a member who has an effective date of membership on or after January 1, 2010, for longevity, shift differential, hazardous duty, work performed on a holiday if it does not exceed the working hours of the normal workweek or pay period for that employee, and, holding oneself ready for duty while off duty and returning to duty within 12 hours after one's regular working hours to respond to an emergency. As used in this subparagraph, "emergency" means a sudden, unexpected occurrence that is declared by the governing body or chief administrative officer of the public employer to involve clear and imminent danger and require immediate action to prevent and mitigate the endangerment of lives, health or property.
>
> (c) Payment for extra duty assignments if it is the standard practice of the public employer to include such pay in the employment contract or official job description for the calendar or academic year in which it is paid and such pay is specifically included in the member's employment contract or official job description.
>
> (d) The aggregate compensation paid by two separate public employers if one member is employed half-time or more by one, and half-time or less by the other, if the total does not

> exceed full-time employment, if the duties of both positions are similar and if the employment is pursuant to a continuing relationship between the employers.
>
> 3. The term does not include any type of payment not specifically described in subsection 2.

NRS. 286.025. "Overtime" does not appear in this section. Metro's overtime policy states, "Overtime pay is NOT subject to retirement system contributions." (#35, at 115). Plaintiffs argue that "employers must still make pension contributions for overtime work if the relevant pay class is included in the definition of compensation[.]" Id. at 10. Plaintiffs assert that the K-9 pay falls under the statutory definition of compensation because it is "salary paid to a member by the member's principal public employer," as (1) "base pay, which is the monthly rate of pay," (2) "hazardous duty pay," and (3) it qualifies under the "extra duty assignments" part of the statute. See id. at 10-11.

i. Base Pay

Plaintiffs argue that because they receive K-9 pay every month, regardless of hours worked, this pay falls under the statute and is subject to pension contributions. Plaintiffs point to a Nevada Attorney General issued opinion stating that "it is the nature of the payment, not the employer's designation of the payment, that is determinative of whether the payment falls within the definition of compensation contained in NRS 286.025." (#39, at 12, Nev. Att'y Gen. Op. 2002-48, at 354). The CBA provides that K-9 pay is overtime pay. According to the opinion, (which is not binding on the Court) the employer's designation of the payment is not determinative. Here, the agreement of the parties prevails, notwithstanding Metro's decision to separate K-9 pay from other categories of overtime.

Plaintiffs received consistent checks every pay period for the amount defined in the CBA, even while on vacation or leave, which is typically prohibited by other employees who did not receive overtime while on various types of leave like workers compensation, FMLA, military leave, etc. Their K-9 pay is distinctly separate from the overtime pay in the payroll system. Plaintiffs also argue that Metro defines overtime as "compensation earned by an employee who is held over his regular shift" and the Handlers were not required to be "held over" because their

1    PSD responsibilities took place when they were off-duty. (#35, at 13, 116).

2    Metro argues that their K-9 duties are overtime hours and the Handlers were placed on notice
3    before accepting the job that they would have these overtime duties after completing their
4    regularly scheduled shift and that this obligation repeated daily. (#38, at 9).

5    The Court finds that according to the plain language of the contract, K-9 pay is overtime pay.
6    The fact that K-9 pay was distinct from overtime pay in the Metro system does not change the
7    express terms of the CBA. Therefore, the Handlers are not entitled to PERS contributions for K-
8    9 overtime pay and summary judgment is granted in favor of Metro.

9        ii.        <u>Hazardous Duty Pay</u>

10   Plaintiffs assert that as Handlers, they were on "hazardous duty" pay under NRS
11   286.025(2)(b)(1) which is defined as "regular additional compensation paid to an eligible
12   employee by a public employer for performing dangerous work." NAC 286.010. Plaintiffs assert
13   caring for the PSDs constituted hazardous pay because the dogs could be dangerous. (#35, at 15-
14   16). There is evidence that some of the Plaintiffs were injured by their PSDs. Metro argues that
15   there is no evidence to support the claim that their job duties fit the category of hazardous pay.
16   (#38, at 10). Metro asserts that if the Department and the bargaining agent believed that Handlers
17   needed hazardous pay then it would have been negotiated for and included in the CBA. <u>Id.</u> The
18   Court agrees. K-9 pay is base pay, but it does not fall into the category of hazardous pay that
19   would entitle them to additional pay, and if the Handlers believe they were entitled to additional
20   pay for these reasons, it was up to them to bargain for it through their representative. Summary
21   judgment on this issue is granted for Metro.

22       iii.       <u>Extra Duty Assignments</u>

23   Plaintiffs also argue that K-9 pay is not overtime pay because it can be classified as "payment
24   for extra duty assignments" under NRS 286.025(2)(c). (#35 at 15-16). Metro argues that taking
25   care of the PSD is part of their normal and customary duties that was included in the job
26   description and cannot be considered "extra duty." (#38, at 9-10). The PERS official policy and
27   NRS 286.025(2) states:

28
> Extra duty assignments are those duties assigned to a member
> which are in addition to and beyond the normal and customary

- 8 -

> duties assigned to or associated with the position occupied by the member and which are distinctly different from the normal and customary duties assigned to or associated with the position occupied by the member.

NRS 286.025(2)(e)(1). Metro argues that Plaintiffs were put on notice about their off-duty obligations before they accepted the job and thus, they cannot say that these duties go "beyond the normal and customary duties assigned to or associated with the position occupied by the member...." as defined by the statute. (#38, at 9). The Court agrees. It is clear that taking care of the PSDs is part of a Handler's normal and customary duty, and Plaintiffs have not demonstrated that these responsibilities go beyond those normal and customary duties. Therefore, summary judgment on the issue of extra duty assignments is granted in favor of Metro.

**B. Unpaid Overtime and Unpaid Wages Pursuant to FLSA and NRS 608.018**

Plaintiffs argue that if K-9 is overtime pay, then pursuant to Fair Labor Standards Act ("FLSA") and NRS 608.018, Plaintiffs are entitled to a judgment ruling that Metro must pay them overtime for the actual hours worked in excess of the 10 or 15 hours of compensation per pay period that they already received according to the CBA. (35, at 19). Metro argues that Plaintiffs are not entitled to wages for the off-duty care and maintenance of the PSDs because that payment is already factored into their pay through the CBA. (#34, at 9).

Under the FLSA, an employer is required to pay an employee one and one-half times the regular rate of pay for an employee who works in excess of 40 hours in a workweek. 29 U.S.C. § 207(a)(1). In order to prevail on an unpaid overtime claim under the FLSA, a plaintiff must prove: "(1) the uncompensated activity constitutes 'work,' (2) the time worked is not de minimis and is reasonable in relation to the principal activity, (3) the employer had actual notice or constructive knowledge of the plaintiff's overtime work, and (4) the amount of time worked." Marshall v. Pollin Hotels II, LLC, 10 F.Supp.3d 1290, 1297 (D. Ore. 2016).

Nevada's state-law analog to the FLSA's overtime compensation requirements is found in NRS 608.018, which states in relevant part:

> NRS 608.018 Compensation for overtime: Requirement; exceptions
>
> (1) An employer shall pay 1 ½ times an employee's regular wage

- 9 -

> rate whenever an employee who receives compensation for employment at a rate less than 1 ½ times the minimum rate set forth in NRS 608.250 works:
>
>> (a) More than 40 hours in any scheduled week of work…
>
> (3) The provisions of subsections 1 and 2 do not apply to:
>
>> (e) Employees are covered by collective bargaining agreements which provide otherwise for overtime;

NRS 608.018. Courts have recognized that parties can enter into agreements establishing the compensation for off-duty activities. Leever v. Carson City, 360 F.3d 1014 (9th Cir. 2004). 29 C.F.R. § 785.23 also provides for an exception to FLSA overtime compensation if the parties have an agreement. See 29 C.F.R. § 785.23. This "regulation provides an exemption from the overtime pay requirement for employers whose employees work from their homes for extended periods of time, such that it would be difficult to compute the exact number of hours actually worked by the employee." Leever, 360 F.3d, at 1017. "In those circumstances, an employer and an employee are permitted to agree on an alternative means of compensating the employee for overtime work, so long as the agreement is 'reasonable' and takes into account 'all of the pertinent facts.'" Id. In Leever, the Court held that "the number of hours actually worked is clearly 'pertinent' to the question of how much compensation ought to be paid for that work." Id. at 1020-21. Leever also held that Union negotiations on behalf of the plaintiff created the relevant agreement. Id. at 1018.

In interrogatories, Metro was asked about what was considered by the Metro representatives when the terms of K9 pay was being negotiated. Metro's response was:

> [G]enerally in negotiating the compensation for K9 handlers, the Department considered K9 handler duties, such as responding to calls for service where K9 assistance is required, requested and/or necessary, as well as the at-home care, grooming, transportation and feeding of the Department's Police Service Dog… the Department researched compensation rates other agencies utilized for compensation to K9 handlers, as well as caselaw…. Representatives of the Las Vegas Police Protective Association, Inc. ("PPA") met with K9 handlers to discuss K9 compensation and also reviewed outside agency compensation rates.

(#34-10, at 3). Metro argues this demonstrates the agreement with Plaintiffs was reasonable.

1  (#34, at 12). Plaintiffs argue that Leever requires much more than what was considered by
2  Metro, including the number of off-duty hours the K-9 unit spent caring for the dogs, which they
3  assert was not taken into account. (#39, at 19-20). However, if the information on the actual
4  hours now being claimed by Plaintiffs was not presented during contract negotiations, they will
5  have to look to their CBA representative for an explanation.
6      Leever held that, interpreting FLSA, an agreement between an employer and employee must,
7  "at a minimum… take into account some approximation of the number of hours actually worked
8  by the employee or that the employee could reasonably be required to work." Leever, 360 F.3d,
9  at 1019. The Court ruled that "requiring parties to approximate the number of hours worked
10 when forming an agreement pursuant to § 785.23 is consistent with the purpose of the FLSA,
11 which is to ensure that employees are paid for 'all hours worked.'" Id. at 1019-20. The Court
12 held that relying exclusively on a comprehensive parity study which "summarized the pay
13 provided by other law enforcement agencies to their canine officers" was not sufficient. Id. at
14 1020. Finally, Leever stated that the department being sued was required "to make a reasonable
15 investigation of the number of off-duty hours its canine officers generally spent working with
16 their dogs each pay period, and to take that figure into account when negotiating the agreement."
17 Id. at 1021.
18     There is no evidence that Metro actively investigated the actual number of hours the
19 Plaintiffs cared for their PSDs while off-duty. However, Leever also stated that in addition to
20 requiring "some approximation of the hours actually worked" the Ninth's Circuit approach is
21 consistent with the Sixth's Circuit approach in Brock v. City of Cinncinati, 236 F.3d 793 (6th
22 Cir. 2001). Id. at 1021. Brock held that "the actual amount of time spent working was 'a
23 reference point for a range of reasonable agreements,' but that the range was 'widened by a
24 variety of non-monetary costs and benefits' provided by the employer" like compensation for
25 costs of caring for the dogs and providing officers with official vehicles to transport their dogs to
26 and from work. Id., quoting Brock, 236 F.3d, at 807.
27     The Court finds that whether there was a "reasonable agreement," and whether or not Metro
28 considered "all the pertinent facts" is an issue appropriate for the jury to consider. There is

1  conflicting evidence and testimony, and since both parties are arguing for summary judgment,
2  the Court must consider the facts in light most favorable to both parties. Therefore, Plaintiff's
3  Second and Eighth Claims are not dismissed and summary judgment on these issues is denied.

**C.  ADP**

Plaintiffs claim that they are entitled to ADP for their on-duty work. (#39, at 21). NRS 288.150(2)(a) identifies the mandatory subjects of collective bargaining, which includes "[s]alary or wage rates or other forms of direct monetary compensation." The ADP section of the CBA says that "Police Officer II (A-2)" receive 8% ADP after one year of service in that role. (#34-6, at 28). Metro asserts that "[t]he majority of classifications who receive ADP are those designated as 'A2' assignments–which are detectives–and Handlers are not detectives." (#34, at 9). Metro also asserts that if the Handlers wanted ADP, then their bargaining agent should have secured it for them. Id.

Plaintiffs argue that they, as Handlers, do fall into the category of Police Officer II. (#39, at 21, #35, at 247). Plaintiffs argue that the term "A-2" is not defined in the CBA or in any other Metro policy. (#35, at 250). When Plaintiffs asked Metro for a definition in discovery, Metro said that Police Officer II (A-2) is a payroll code for which "there is no official 'definition' for the term A-2." Id. at 254. Plaintiffs also argue that because they are Handlers who work adjacent to specialized units like SWAT (SWAT receives ADP), they too are entitled to it. (35, at 24-25).

However, it was up to the Plaintiffs and their bargaining representative to negotiate this issue. And in fact, this issue was discussed during negotiations. Plaintiff Newton was communicating via text message with PPA Vice President Scott Nicholas ("Nicholas") about obtaining ADP for K-9. Newton said to Nicholas, "my main concern is getting ADP defined. That way it benefits more people and is more fair. Then we can put people in the proper categories which includes K9." (#38, at 134). The bargaining agent, PPS, had the right to declare an impasse regarding ADP for K-9 if it believed that the designation of classifications of covered employees who received ADP was improper.

The Court finds that ADP was part of the mandatory bargaining under NRS 288.150(2)(a) and failure to bargain for it does not mean Plaintiffs are entitled to it through litigation. Metro

had no legal obligation to pay ADP to K-9 Handlers, and therefore summary judgment is granted for Metro on the issue of ADP.

IV. Conclusion

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (#35) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (#34) is **GRANTED** in part and **DENIED** in part.

DATED this 28th day of March 2023.

Kent J. Dawson
United States District Judge